**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CARI D. SEARCY, et. al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:14-cv-00208-N** |
| | ) | |
| **ROBERT BENTLEY, et. al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs, by and through undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submits this their Brief in Support of Plaintiffs' Motion for Summary Judgment as follows:

**PREFACE**

While sitting in a Birmingham jail cell after wrongfully being arrested for organizing and participating in a civil rights march, one of  Alabama's greatest residents and one of our nation's greatest sons eloquently wrote:

> "Moreover, I am cognizant of the interrelatedness of all communities and states. I cannot sit idly by in Atlanta and not be concerned about what happens in Birmingham. **Injustice anywhere is a threat to justice everywhere**. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly, affects all indirectly. Never again can we afford to live with the narrow, provincial 'outside agitator' idea. **Anyone who lives inside the United States can never be considered an outsider anywhere within its bounds**." Martin Luther King, Jr., *Letter from a Birmingham Jail*, (April 16, 1963). (emphasis added)

The Civil Rights Protests of the 1960's reflected a struggle to end discrimination arising out of the immutable characteristic of race—intrinsic to the person and over which African Americans had no control. This lawsuit challenges discrimination that is just as invidious and equally unjust and which also is based on immutable characteristics. Plaintiffs here can no more   change their sexual orientation than African-Americans can change the color of their skin. Thus, as with the Civil Rights Protests of the past, the quest to end discrimination based on sexual orientation challenges the state's continuing efforts to clothe discrimination in a mantle of righteousness that is grounded in nothing more than the state's disapproval of characteristics intrinsic to the person.

The choice as to whether or whom to marry, or whether or when to have children, along with the myriad of other choices that form the fundamental rights of personhood demands that the Plaintiffs' choice to be partners in a same-sex marriage, and to raise children within the structure of that relationship, be protected from the kind of infringement on those rights that the State of Alabama imposes here. Alabama's direct discrimination and abrupt nullification of lawful same gender marriages affects all those lawfully married in other states and particularly their children. Conceptually and practically, equality is an all-or nothing proposition, and equality cannot possibly exist unless it exists for everyone. Injustice anywhere is a threat to justice every.

Truly, we the people, reached these American shores in different boats from different places, but now that we are here, we are all in the same boat. It is past time, but not too late, for the sunlight of liberty to disinfect the discrimination faced by lawfully married, same-sex couples and their children. The Plaintiffs in this lawsuit, by and through their attorneys, respectfully request this Honorable Court allow the purifying light of liberty and equality to shine on all of Alabama's adult residents, and, just as importantly if not more so, on all of Alabama's children.

## **INTRODUCTION**

This lawsuit is brought by a family consisting of (1) a same-sex couple who were married in California and (2) their eight year old son. the Plaintiffs sue to compel Alabama to legally recognize the marriage and legally recognize both of the parents, not just the biological mother.This case challenges the application of Alabama Const. Art. I §36.03(5) (2006) and Ala. Code §30-1-19 (hereinafter collectively referred to as the "Alabama Sanctity Laws") to same-sex couples who married under the laws of other states.

Currently, nineteen states[1] and the District of Columbia recognize same-sex marriages. The Plaintiffs were married in one of these states, California. Alabama does not recognize legal marriages between people of the same gender for any legal purpose. The Plaintiffs seek to compel Alabama to give full faith and credit to their marriage license issued by California and to legally recognize the couple as entitled to all the rights and benefits accorded to married couples by the State of Alabama, including but not limited to, the right to adopt a child.

The Alabama Sanctity Laws provide that a marriage must be between a man and a woman and prohibit the issuance of a marriage license to same-sex couples within Alabama. his in itself is a denial of equal protection in violation of the Fourteenth Amendment to the United States Constitution. More significant, however, the Alabama Sanctity Laws nullifies those marriages legally entered into and accorded lawful status in other states, mandating that the state "shall not recognize as valid any marriage of parties of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued or not." Alabama Const. Art. I §36.03 (2006); Ala. Code 1975 §30-1-19(e). The nullification of a lawful marriage entered into in another state has countless

_____

[1] States that issue marriage licenses to same-sex couples (19 states and D.C.): *California* (2013), *Connecticut* (2008), *Delaware* (2013), *District of Columbia* (2010), *Hawaii* (2013), *Illinois* (2014), *Iowa* (2009), *Maine* (2012), *Maryland* (2013), *Massachusetts* (2004), *Minnesota* (2013), *New Hampshire* (2010), *New Jersey* (2013), *New Mexico* (2013), *New York* (2011), *Oregon* (2014), *Pennsylvania* (2014), *Rhode Island* (2013), *Vermont* (2009) and *Washington* (2012).
*Oklahoma, Virginia, Kentucky*, and *Idaho*: On January 14, 2014, the United States District Court for the Northern District of Oklahoma ruled that Oklahoma's ban on marriage equality is unconstitutional. On February 13, 2014, the United States District Court for the Eastern District of Virginia ruled that *Virginia's ban on marriage equality is unconstitutional.* In both of these two cases the rulings are stayed pending appeal, meaning marriages will not occur immediately in Oklahoma or Virginia. On February 11, 2014, the United States District Court for the Western District of Kentucky ruled that the states's marriage amendment is unconstitutional and that the Commonwealth cannot refuse to recognize valid same-sex marriages conducted in other states. On May 13, 2014, U.S. Magistrate Judge Candy Dale ruled that Idaho's ban on marriage equality is unconstitutional (May 16th, 2014; Ninth Circuit Court of Appeals granted a temporary request for a stay). In 2013 the Sixth Circuit Federal Court in *Ohio*, ruled that Ohio must recognize marriages performed in other states under the Obergefell v. Wymyslo, 962 F. Supp. 968, 994-995(S.D.Ohio 2013) but stayed the issue as to whether the state of *Ohio* had to issue instate marriage licenses in a separate April 2014 case.
*Michigan*, *Utah* and *Arkansas*: On March 21, 2014, the United States District Court for the Eastern District of Michigan ruled that the state's ban on marriage equality is unconstitutional. The U.S. Court of Appeals for the Sixth Circuit issued a stay until appeal. On December 20, 2013, a federal district court judge in Utah ruled that the state constitutional amendment barring same-sex couples from marriage violates the United States Constitution, and on January 6, 2014 the Supreme Court of the United States issued a stay pending a decision on the merits. On May 9, 2014, the Sixth Judicial Circuit in *Arkansas* ruled that the state's ban on marriage equality is unconstitutional (the *Arkansas* Supreme Court issued a stay temporarily halting the issuance of marriage licenses on May 16, 2014). *Wyoming* and *Texas* presently have also ruled that the trial courts have jurisdiction over divorce proceedings terminating same-sex marriages created in other jurisdictions.  http://hrc-assets.s3-website-us-east-1.amazonaws.com//files/assets/resources/marriage-equality_6-2014.pdf

detrimental effects on the Plaintiffs and other similarly situated persons in Alabama. The Equal Protection Clause of the Fourteenth Amendment forbids a state, including Alabama, from denying "to any person within its jurisdiction the equal protection of the laws." Its umbrella extends to shield the Plaintiffs from the very type of disparate treatment suffered here.

## <u>BACKGROUND</u>

The concept of marriage is such an elemental component of what it means to be human that it barely requires a definition. Throughout our history and in our current time, the various faiths, religions, governments, denominations, and social organizations of the world have defined, legitimized, and approved numerous types of marriages. Historically speaking, the most "traditional" form of marriage has not been between one man and one woman, but between one man and *multiple* women," <u>Wolf v. Walker</u>,  2014 U.S. Dist. LEXIS 77125 *98 (quoting from the June 6, 2014 Wisconsin Federal Court).

Across history, orders from the pens of various justices of the Supreme Court,   have described marriage as "the foundation of the family and of society" (*Maynard v. Hill*, 125 U.S. 190, 211 (1888));  "the most important of all the social relations" (*Moyler v. Moyler*, 11 Ala. 620, 623 (1847)); and "[i]t is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965). Marriage means different things to different people, and this holds true across the landscape of human history. Perhaps, Mildred Loving herself, a plaintiff in *Loving v. Virginia*, stated, "[t]he majority believed . . . that it was God's plan to keep people apart and that the government should discriminate against people in love" but that she believes that "all Americans, no matter their race, no matter their sex, no matter their sexual orientation, should have that same freedom to marry". <u>Wolf</u>, 2014 U.S. Dist. LEXIS 77125 *56 (quoting Mildred Loving from an excerpt in Martha C. Nussbaum, From Disgust to Humanity: Sexual Orientation and the Constitution 140 (Oxford University Press 2010).

Permitting and recognizing same-sex marriage is a relatively new American legal practice, although it is not without historical precedent, including in western countries. Same-sex marital unions were common in Ancient Greece, Ancient Rome, Ancient Mesopotamia, and in China. *See e.g., Homosexuality in the Ancient World*, Wayne Dynes and Stephen Donaldson (Garland, 1992) and *Passions of the Cut Sleeve: The Male Homosexual Tradition in China*, Bret Hinsch (Reed Business Information, Inc., 1990).

In the middle of the 1990's, several states began to debate whether to allow same-sex marriage. Prior to any state legalizing same-sex marriage, in 1996, Congress enacted the Defense of Marriage Act (DOMA) 28 U.S.C. § 1738 which provides two operative provisions in DOMA found at Sections 2 and 3 respectively:

> (2) **Powers Reserved to the States**: No State, territory, or possession of the United States or Indian Tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

> (3) **Definition of Marriage**: In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife.[2]

The State of Alabama has two different laws restricting and nullifying same-sex marriages—a Constitutional Amendment found at Alabama Const. Art. I, § 36.03 (2006) and a statute found at Ala. Code 1975 § 30-1-19.

Alabama Const. Art. I § 36.03 (2006)[3] states as follows:

(1) This amendment shall be known and may be cited as the Sanctity of Marriage Amendment.
(2) Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting this unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.
(3) Marriage is a sacred covenant, solemnized between a man and a woman, which, when the legal capacity and consent of both parties is present, establishes their relationship as husband and wife, and which is recognized by the state as a civil contract.
(4) No marriage license shall be issued in the State of Alabama to parties of the same sex.
(5) The State of Alabama shall not recognize as valid any marriage of parties of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued.
(6) The State of Alabama shall not recognize as valid any common law marriage of parties of the same sex.
(7) A union replicating marriage of or between persons of the same sex in the State of Alabama or in any other jurisdiction shall be considered and treated in all respects as having no legal force or effect in this state and shall not be recognized by this state as a marriage or other union replicating marriage.

---

[2]This section was held to be unconstitutional by the Supreme Court in *U.S. v. Windsor*, 133 S.Ct. 2675 (2013)

[3] This constitutional amendment was approved by the voters of Alabama in 2006 by a margin of 81.24% to 18.76%.

Ala. Code 1975 § 30-1-19[4] states as follows:

(a) This section shall be known and may be cited as the "Alabama Marriage Protection Act."
(b) Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting the unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.
(c) Marriage is a sacred covenant, solemnized between a man and a woman, which, when the legal capacity and consent of both parties is present, establishes this their relationship as husband and wife, and which is recognized by the state as a civil contract.
(d) No marriage license shall be issued in the State of Alabama to parties of the same sex.
(e) The State of Alabama shall not recognize as valid any marriage of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued.

Alabama has long allowed various forms of adoption, including step-parent adoptions whereby a spouse may adopt his/her spouse's biological children when certain conditions are met. The statutes addressing adoptions are found at Ala. Code 26-10A-1 through 26-10A-38 (1975). Several of these Alabama statutes are relevant to this matter.

First, Ala. Code § 26-10A-5(a) (1975) states that "Any adult person or husband and wife jointly who are adults may petition the court to adopt a minor."

Second, Ala. Code § 26-10A-6 (1975) states that "The following persons may be adopted: (1) A minor."

Third, Ala. Code § 26-10A-27 (1975) titled "Stepparent Adoptions" states:

Any person may adopt his or her spouse's child according to the provisions of this chapter except that:
(1) Before the filing of the petition for adoption, the adoptee must have resided for a period of one year with the petitioner, unless this filing is waived by the court for good cause shown;
(2) No investigation under Section 26-10A-19[5] shall occur unless otherwise directed by the court; and
(3) No report of fees and charges under Section 26-10A-23[6] shall be made unless ordered by the court.

---

[4] This statute was passed in 1998 by the Alabama legislature and became law that same year.

[5] This statute addresses investigations by the Alabama Department of Human Resources; it is inapplicable to this matter.

[6] This statute prohibits, among other things, monies to be paid for adoption placement services. It also provides accountings necessary in various types of adoptions. It is inapplicable to this matter.

Fourth, Ala. Code § 26-10A-7 (1975) provides the consent requirements and methods for obtaining the same. It is largely inapplicable to this matter in that the natural, biological father did in fact provide written although his consent was not required under Alabama law.

### STATEMENT OF UNDISPUTED MATERIAL FACTS AND PROCEDURAL HISTORY

Kimberly McKeand (hereinafter referred to as "McKeand") and Cari D. Searcy (hereinafter referred to as "Searcy") are female adult resident citizens of the state of Alabama, and each has been domiciled in Mobile, Alabama for the last 13 years. (Affidavit of McKeand attached hereto as Exhibit "A"; Affidavit of Searcy as Exhibit "B".) McKeand and Searcy have been in an exclusive, monogamous, romantic relationship for approximately 14 years . (Complaint at ¶ 12; Affidavit of McKeand and Searcy).

McKeand and Searcy have lived together in Mobile, Alabama for the last eleven years (Affidavit of McKeand and Searcy). McKeand and Searcy desired to have a child together, and utilized a sperm donor, Michael James Waldron (Complaint ¶ 18-19; Affidavit of McKeand and Searcy). McKeand conceived and later gave birth to K.S. on December 30, 2005, in Mobile, Alabama (Complaint at #18; Affidavit of McKeand and Searcy). The minor child, K.S.'s birth certificate is attached hereto as Exhibit "C". The sperm donor, Waldron, has never been present in the minor child's life and has no legal parental rights, and executed a waiver and consent to adopt on February 6, 2006. (Waldron waiver attached hereto as Exhibit "D.").

K.S. suffered numerous health problems at birth and Searcy was not permitted to attend doctor visits, participate with his treatment in the hospital and the like; because Searcy was not a legally recognized parent to K.S. (Affidavit of McKeand and Searcy, ¶ 10).

After California legalized same-sex marriage, Searcy and McKeand travelled to San Diego and were legally married on September 23, 2008. (Complaint, ¶ 13; and Affidavit of McKeand and Searcy).

On December 29, 2011, Searcy filed a petition in the Probate Court of Mobile County seeking to adopt K.S. under a provision of the Alabama Adoption Code, §26-10A-1., Ala. Code 1975. (Searcy's Petition to Adopt, attached hereto as Exhibit "E"; Doc. 1, p.6 ). On or about April 6, 2012, the Probate Court

denied the adoption petition because Searcy is not McKeand's "spouse" under Alabama law. (A copy of the Probate Court's Order is attached hereto as Exhibit "F"; Doc. 1, p. 6).

Searcy filed a timely notice of appeal, and the matter was assigned to the Alabama Civil Court of Appeals (In re Adoption of K.R.S., 109 So. 3d 176 (Ala. Civ. App. 2012) is attached hereto as Exhibit "G." Relying on the same facts asserted by the Mobile Probate Court in its order of April 6, 2012, the Court affirmed the Probate Court's judgment holding that Searcy could not adopt K.S. under the step-parent adoption statute. (Id.) The Court stated that Searcy and McKeand are not considered "spouses" under the Alabama Sanctity Laws because their marriage is not recognized under Alabama law. Both courts rely upon Ala. Code 1975 § 30-1-19(e) which states: "The State of Alabama shall not recognize as valid any marriage of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued"; and further relied upon the Federal DOMA statute definition of marriage as "between one man and one woman" which has since been found to be unconstitutional by U.S. Supreme Court decision in Windsor, 133 S.Ct. 2675 (2013). The Court also stated the only way in which Searcy would be allowed to adopt K.S. was if McKeand, the biological mother, terminated her parental rights relative to K.S. thereby relinquishing her rights as a legal parent. Id. at 177, 178 (footnote 1).

K.S., McKeand and Searcy have considered both McKeand and Searcy to be the parents of K.S. since birth. (Affidavit of McKeand and Searcy at ¶ 6). Both continue to maintain the day-to-day responsibilities of raising and providing for the needs of K.S. (Id.) They celebrate holidays together, enjoy family vacations together, jointly participate in the educational activities of K.S., and attend to his mental and emotional well-being. Searcy and McKeand do everything that an opposite-gender, married couple does for their child. (Id.). In short, McKeand and Searcy, both consider K.S. as their son and K.S. considers both Searcy and McKeand as his parents.(Id.) Searcy and McKeand assert that the recognition of Searcy as a legal parent is necessary for the benefit and protection of K.S. (Id.) Searcy and McKeand want Searcy to be a legally recognized parent to K.S., and they are pursuing that goal primarily for the benefit and protection of K.S. (Id.) Searcy and McKeand are also seeking to have the Alabama Sanctity Laws declared unconstitutional to the extent it prohibits the State of Alabama from recognizing that Searcy and McKeand are married "spouses". (Id.)

## STANDARD OF REVIEW

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc. 929 F.2d 604, 608 (11th Cir. 1991).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence… that would entitle it to a directed verdict if not controverted at trial. [citation omitted]. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*); accord Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If, however, the movant caries the initial summary judgment burden…, the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." Fitzpatrick, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." Clark, 929 F. 2d at 608 (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may…consider the fact undisputed for purposes of the motion…").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmoving…" McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003). However, "there is no burden on the Court to identify unreferenced evidence supporting a party's position. Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited." Jurich v. Compass Marine, Inc. 2013 U.S. Dist. LEXIS 159557 *4, 2013.

## ARGUMENT

## A.    THE ALABAMA SANCTITY LAWS VIOLATE THE CONSTITUTION'S EQUAL PROTECTION CLAUSE FOUND IN THE 14TH AMENDMENT.

### (i) The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment forbids a state, including Alabama, from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amendment XIV, § 1.

One of the fundamental purposes of the Equal Protection Clause has been described as a legal duty on the part of a state that "all persons similarly situated should be treated alike. "Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985). At a minimum, this means that no state government can justify purposeful disparate treatment of an identifiable group thereby putting that group at a disadvantage and under a legal burden no matter how politically or socially unpopular that identifiable group may be. Romer v. Evans, 517 U.S. 620, 634 (1996); Windsor, at 2675; and Cleburne at 450.

On the other hand, states are empowered to "perform many of the vital functions of modern government," Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2578 (2012), which necessarily involves adopting regulations which distinguish between certain identifiable groups within society. Therefore, generally speaking, all courts must balance equal protection principles with the practical, legitimate purposes of state and local governments when reviewing equal protection challenges to state laws.

### (ii)  Level of Scrutiny

The Supreme Court has developed three categories for analyzing a challenges under the Equal Protection Clause. The level of scrutiny depends on the characteristics of the group affected or the rights implicated by the challenged law.

### (a) Rational Basis Scrutiny

A law that that does not target a suspect class and that does not burden a fundamental right is analyzed under the rational basis level of scrutiny. Heller v. Doe, 509 U.S. 312, 319-21 (1993). Under rational basis scrutiny, a federal court will presume the state law is valid unless the challenger can show that the difference in treatment created by the law bears no rational relationship to a conceivable legitimate

governmental interest. Id. at 320. A classification or difference in treatment does not fail rational basis review merely because the law is not crafted specifically enough or because it results in some inequality. Id.

Even though the rational basis standard provides the most deference to the law in question, a "state may not rely on a classification whose relationship to the asserted goal is attenuated as to render the decision arbitrary or irrational." Cleburne, 473 U.S. at 446. Federal courts "insist on knowing the relation between the classification adopted and the object to be attained." Romer, 517 U.S. at 632; Heller, 509 U.S. at 321 (even under a rational basis level of scrutiny, the classification must "find some footing in the realities of the subject addressed by the legislation"). Likewise, a federal court will also closely review the "governmental purpose" of the law in question because "some objectives…are not legitimate state interests." Vance v. Bradley, 440 U.S. 93, 97 (1979).

Tradition and "because we've always done it this way" are not, on their own, good enough reasons to form a "rational basis" for a law. Heller v. Doe, 509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis"). This is especially true when a particular form of discrimination has been historically present, i.e., when the discrimination is "tradition" in the given state. Cleburne, 473 U.S. at 454 n. 6 (Stevens, J., concurring) ("The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a tradition of disfavor for a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification.").

**(b) Intermediate Scrutiny**

"Intermediate" or "heightened" scrutiny is applied to quasi-suspect groups that face discriminatory laws on the basis of gender, alienage, or illegitimacy. Clark v. Jeter, 486 U.S. 456, 461 (1988); Miss Univ. for Women v. Hogan, 458 U.S. 718, 723-24 (1982). Quasi-suspect classes may only face discrimination or legal classifications if a state shows that the classification/discrimination is "substantially related to an important governmental objective." Id. Discrimination against a quasi-suspect class, such as women, must be supported by an "exceedingly persuasive justification" and "not hypothesized or invented *post hoc* in response to litigation." United States v. Virginia, 518 U.S. 515, 533 (1996). The purpose of this heightened scrutiny is to ensure that quasi-suspect classifications do not perpetuate unfounded stereotypes or second-class treatment. Id. at 534.

**(c) Strict Scrutiny**

This level of scrutiny applies when a legislative classification "impermissibly interferes with the existence of a fundamental right or operates to the peculiar disadvantage of a suspect class." Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 312 (1976). "Suspect classes" for these purposes include racial, ethnic, and religious groups. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995); Korematsu v. United States, 323 U.S. 214, 216 (1944). Such classifications are presumed to be unconstitutional and will survive strict scrutiny only when the state government can show the law is narrowly tailored to a compelling state government interest.

**(iii) Marriage is a fundamental right, and state laws that infringe upon that right are due to receive heightened scrutiny.**

Although marriage is not expressly identified as a fundamental right in the Constitution, the Supreme Court has repeatedly recognized it as a fundamental right. M.L.B. v. S.L.J., 519, U.S. 102, 116 (1996) (personal choices about marriage "are among associational rights this Court has ranked as 'of basic importance in our society.'"); Planned Parenthood of Southern Pennsylvania v. Casey, 505 U.S. 833, 848 (1987) (holding that marriage is "an aspect of liberty protected against state interference by the substantive component of the Due Process Clause"); *Turner v. Safley*, 482 U.S. 78, 97 (1987) (holding that a state regulation that prohibited state inmates from marrying without the permission of the warden impermissibly burdened their right to marry); Zablocki v. Redhail, 434 U.S. 374, 383-84(1978) (holding that marriage is a fundamental liberty right); Carey v. Population Servs., Int'l, 431 U.S. 678, 684-85 (1977) (holding that the right to privacy includes personal decisions relating to the marriage); United States v. Kras, 409 U.S. 434, 446 (1973) (holding marriage as fundamental); Loving v. Virginia, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our existence and survival").

The Supreme Court has held the liberty guaranteed by the Fourteenth Amendment extends beyond the Bill of Rights to "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under the compulsion of the State." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 851 (1992). These rights are directly at the heart of what it means to be human—who to marry, whether to have children, and how to raise and educate children. Lawrence v. Texas, 539 U.S. 558, 574 (2003). Such choices

are protected against state interference of any kind because they implicate "associational rights…'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard or disrespect." M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (quoting Boddie v. Connecticut, 401 U.S. 371, 376 (1971)).

**(iv) The Parent/Child relationship is also a fundamental right.**

Personal choices concerning family living situations are a fundamental right, and state laws that burden this right is due careful scrutiny by courts. Stated differently, "it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education." Carey v. Population Serv's Int'l, 431 U.S. 678, 684-85 (1977). The Supreme Court has instructed that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." Moore v. City of East Cleveland, 431 U.S. 494, 499 (1977).

This tradition has long been part of our constitutional framework and Supreme Court precedent. M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard or disrespect."); Lawrence v. Texas, 539 U.S. 558, 574 (2003) ("our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, and education…Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do."); Pierce v. Society of Sisters, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); Prince v. Commonwealth of Mass., 321 U.S. 158 , 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder…It is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter."); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their

children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); Smith v. Organization of Foster Families, 431 U.S. 816, 823 (1977) ("The liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights[.]"); Quilloin v. Walcott, 433 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); Parham v. J.R., 442 U.S. 584, 602-603 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children…Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state."); Santosky v. Kramer, 455 U.S. 745, 760 (1982) ("Until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."); Washington v. Glucksburg, 521 U.S. 702, 720-721 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights . . . to direct the education and upbringing of one's children. The Fourteenth Amendment forbids the government to infringe ... 'fundamental' liberty interests of all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."); Troxel v. Granville, 530 U.S. 57, 65-66 (2000) ("The liberty interest at issue in this case-the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court. In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children…The Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made.").

**(v) The Sanctity Laws should be evaluated using Intermediate Scrutiny standards of review. Regardless of the level of scrutiny, the Sanctity Laws are unconstitutional in violation of the Equal Protection Clause.**

Homosexuals are not a traditional suspect group, but the courts have recently changed this. In deciding whether a new classification qualifies as a suspect or quasi-suspect class, the Supreme Court considers:

> A) whether the class has been historically "subjected to discrimination"; B) whether the class has a defining characteristic that "frequently bears a relation to ability to perform or contribute to society"; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group"; and D) whether the class is "a minority or politically powerless."
> Bowen v. Gilliard, 483 U.S. 587, 602 (1987); Obergefell, at 987-988.

In Windsor, the Supreme Court affirmed the Second Circuit's ruling using heightened scrutiny to evaluate same sex marriage recognition bans. The Court held (a) homosexuals as a group have historically endured persecution and discrimination; (b) homosexuality has no relation to aptitude or ability to contribute to society; (c) homosexuals are a discernible group with non-obvious distinguishing characteristics, especially in the subset of those who enter same-sex marriages; and (d) the class remains a politically weakened minority.  Windsor v. United States, 699 F. 3d 169, 181-82 (2d Cir. 2012), *aff'd* United States v. Windsor, 133 S.Ct. 2675 (2013)).

Following Windsor's directives, state same sex marriage bans and out of state same-sex marriage recognition bans have been judged under heightened scrutiny, (i.e. intermediate and strict scrutiny combined) and rational basis review. **Rational Basis Scrutiny**—Kitchen v. Herbert, 961 F. Supp. 2d  1181, 1188 (D. Utah 2013) (the state's current laws denies gay and lesbian citizens their fundamental rt. to marry and demeans the dignity of these same sex couples for no rational reason.") DeLeon, 2014 U.S. Dist. LEXIS 26236, 50-51 (W.D. Texas, San Antonio Division) ("For now, the Court finds it is not necessary to apply heightened scrutiny to Plaintiff's equal protection claim since Texas' ban on same-sex marriage fails even under the most deferential rational basis level of review"); Bishop, 962 F. Supp. 2d 1252, 1291-95 (N.D. Ohio 2013) (State's argument as to minors was "so attenuated from any of the asserted goals that the exclusion cannot survive rational basis review")—**Heightened/ Intermediate Scrutiny**— Windsor, 699 F.

3d 169; Greigo v. Oliver, intermediate scrutiny  must be applied because the LGBT community is a discrete

group subjected to a history of discrimination and has not been able to politically, (N.M. 2013); Obergefell v.

Wymyslo, 962 F. Supp. 968, 994-995(S.D.Ohio 2013) (the Court applied intermediate scrutiny because the

state of Ohio, "was intruding into and in fact, erasing Plaintiff's already established marital and family

relations."); Whitewood v. Wolf, 2014 U.S. Dist. LEXIS 68771, *47 (P.A. 2014) (The Court stated,

"[h]aving concluded that classifications based on sexual orientation are quasi-suspect, we proceed to apply

intermediate scrutiny to the marriage laws in consideration of their constitutionality.) In considering the

Court's history and rulings, Alabama must show the Sanctity Laws advance a substantial governmental

interest, or at least a legitimate state interest and they are narrowly tailored to achieve that stated purpose.

    In reality, the Alabama Sanctity Laws are incredibly broad and cannot be said to be "narrowly

tailored" in any conceivable way. Likewise, Alabama cannot show any substantial governmental interest, or

even a legitimate state interest, that is being advanced by the Sanctity Laws.

    **(a) The Sanctity Laws unconstitutionally declare the marriage void.**

    Both the Alabama statute and the Alabama Constitutional Amendment state "[t]he State of Alabama

shall not recognize as valid any marriage of parties of the same sex that occurred or was alleged to have

occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued." The

statute goes further in driving home its point by stating "[a] union replicating marriage of or between

persons of the same sex in the State of Alabama or in any other jurisdiction shall be considered and treated in

all respects as having no legal force or effect in this state and shall not be recognized by this state as a

marriage or other union replicating marriage." Ala. Code §30-1-19

    The actual purpose of the Sanctity Laws could not be clearer,—the statute itself states  "[m]arriage

is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a

special interest in encouraging, supporting, and protecting the unique relationship in order to promote,

among other goals, the stability and welfare of society and its children. A marriage contracted between

individuals of the same sex is invalid in this state." Id.

    Similar to the Alabama Sanctity Laws, the Federal DOMA statute defined marriage as existing only

between one man and one woman and stated the federal government would not recognize same-sex

marriages issued by states. 1 U.S.C. § 7. In striking down this portion of DOMA, the Supreme Court stated that a same-sex marriage ban:

> "[o]perates to deprive same-sex couples of the benefits and responsibilities that come with federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class. The avowed purpose and practical effect of the the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States."
> <u>United States v. Windsor</u>, 133 S.Ct. 2675, 2693 (2013).

Likewise, the Court also stated DOMA's "demonstrated purpose is to ensure that if any State decides to recognize same-sex marriages, those unions will be treated as second-class marriages for purposes of federal law." <u>Id</u>. at 2693-94.

Alabama's Sanctity Laws, especially the provisions refusing to acknowledge same-sex marriages entered in to under the laws of other states, does exactly what the Supreme Court said the federal government could not do—refuse to acknowledge and accept for legal purposes same-sex marriages entered in to in any other state. The Sanctity Laws, just like DOMA, have the "principal effect to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency." <u>Id</u>. at 2694. It simply was not enough for Alabama to just disapprove of same-sex marriages; rather, Alabama went a step further to unilaterally and summarily declare all such marriages from other states as void.

Simply put, the Alabama Sanctity Laws do not advance any legitimate governmental interest. In <u>Windsor</u>, the Court states:

> "DOMA instructs all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worth than the marriages of others. The federal statute is invalid for no legitimate purpose overcomes the purpose and effect to disparage and injure these whom the State, by its marriage laws, sought to protect in personhood and dignity. By seeking to displace this protection and treating those persons as living in marriages less respected than others, the federal statute is in violation of the Fifth Amendment." <u>Id.</u> at 2696.

The Alabama Sanctity Laws unconstitutionally do what DOMA did before the Supreme Court issued its <u>Windsor</u> opinion. Alabama's Sanctity Laws create a stigma and a second-class tier of citizens and marriages. It humiliates a group of people  simply because they are lawfully married to a person of the same gender. The Sanctity Laws serve no legitimate governmental purpose.

The Alabama Sanctity Laws are overly broad and are unlimited in scope. They are not narrowly tailored. Rather, with a few short sentences, Alabama has unilaterally voided countless marriages. The Sanctity Laws cannot possibly paint with any broader of a brush.

While courts have reached the different conclusions as to which level of scrutiny is appropriate to apply, all federal courts which have evaluated similar situations involving similar statutes have reached the conclusion that laws which are identical or nearly so to the Alabama Sanctity Laws do not even survive rational basis review. <u>Ala. Code (1975) §30-1-19</u>.

Even under the rational basis level of review, the Alabama Sanctity Laws do not advance a legitimate state interest and are not rationally related to the pursuit of a legitimate state interest, and Alabama can not advance a rational or legitimate state interest which is rationally supported by the state's continued refusal to acknowledge the Plaintiffs' lawful   marriage. As one federal judge recently noted, "without a rational relationship to a legitimate governmental purpose, it [the substantially similar Texas ban on gay marriage and ban on recognition of same-sex marriages entered in to in other states] denies same-sex couples the benefits, dignity and value of celebrating marriage and having their out-of-state marriage recognized." <u>DeLeon v. Perry</u>, 2014 U.S. Dist. LEXIS 26236, 50-51 (W.D. Texas , San Antonio Division, February 26, 2014). The same judge stated "For now, the Court finds it is not necessary to apply heightened scrutiny to Plaintiffs' equal protection claim since Texas' ban on same-sex marriage fails even under the most deferential rational basis level of review." *Id.* at *39.

### (b) Alabama's purported governmental purposes reflected in the Sanctity Laws.

Before addressing the purported "purposes" of the Alabama Sanctity Laws, Plaintiffs offer that one of the sub-textual purposes of the "Sanctity Laws" is to advance a religious/moral view of what marriage

means. "Sanctification" is the act or process of acquiring sanctity, of being made or becoming holy. Oxford English Dictionary, 2nd ed.Sanctify: "to make (a person) holy, to purify or free from sin."[7]

The word "sanctity" and its various derivatives appear in the King James Bible approximately sixty-three times. Strong's Exhaustive Concordance of the Bible: Updated and Expanded Edition, James Strong (2007 ed.). Once viewed within the context of the Sanctity Laws, it is clear that Alabama has, whether intentionally or not, attempted to define marriage in a religious way. After all, the word "sanctity" gives it away. Likewise, the laws' statement that marriage is a "solemn covenant" also plainly reveals the Sanctity Laws' religious overtones.

## STABILITY OF CHILDREN

---

[7]Webster's Revised Unabridged Dictionary (1913 ed. at p. 1273) provides the following definition of Sanctity:
Sac"ti*ty (?), n.; pl. Sanctities (#). [L. sanctitas, from sanctus holy. See Saint.]

1. The state or quality of being sacred or holy; holiness; saintliness; moral purity; godliness.

To sanctity she made no pretense, and, indeed, narrowly escaped the imputation of irreligion. Macaulay.

2. Sacredness; solemnity; inviolability; religious binding force; as, the sanctity of an oath.

3. A saint or holy being.

Syn. -- Holiness; godliness; piety; devotion; goodness; purity; religiousness;sacredness; solemnity.

Similarly, "Sanctify" is defined as follows:

Sanc"ti*fy (?), v. t. [imp. & p. p. Sanctified (?); p. pr. & vb. n. Sanctifying (?).] [F. sanctifier, L. sanctificare; sanctus holy + -ficare (in comp.) to make. See Saint, and -fy.]

1. To make sacred or holy; to set apart to a holy or religious use; to consecrate by appropriate rites; to hallow.

God blessed the seventh day and sanctified it. Gen. ii. 3.
Moses . . . sanctified Aaron and his garment. Lev. viii. 30.
2. To make free from sin; to cleanse from moral corruption and pollution; to purify.

Sanctify them through thy truth. John xvii. 17.
3. To make efficient as the means of holiness; to render productive of holiness or piety.

A means which his mercy hath sanctified so to me as to make me repent of that unjust act. Eikon Basilike.
4. To impart or impute sacredness, venerableness, inviolability, title to reverence and respect, or the like, to; to secure from violation; to give sanction to. Webster's Revised Unabridged Dictionary (1913 ed. at p. 1273).

Alabama's purported purpose in enacting the Sanctity Laws is to promote the stability and welfare of children. Ala. Code (1975) §30-1-19(b). To this point, a San Antonio federal judge recently responded to this same argument:"[t]here is no doubt that the welfare of children is a legitimate state interest; however limiting marriage to opposite-sex couples fails to further this interest." DeLeon v. Perry, 2014 U.S. Dist. LEXIS 26236 *40-41 (W.D. Texas, February 26, 2014). Additionally, the U.S. District Court of Pennsylvania most recently held that same-sex couples and their children "suffer a multitude of daily harms, for instance in the areas of child-rearing, healthcare, taxation, and end of life-planning". Whitewood v. Wolf, at *15 (M.D. Pennsylvania, May 20, 2014). The Alabama Sanctity Laws, just like Texas, Pennsylvania  and the other similarly worded marriage bans, "cause needless stigmatization and humiliation for children being raised by the loving same-sex couples being targeted." Id. at 41 (citing Bostic v. Rainey 2014 U.S. Dist. LEXIS 19110, 2014 WL 561978 at *18 (E.D. Va. February 13, 2014)). Courts across the country have continued to unequivocally state that "Homosexual couples are as capable as other couples of raising well-adjusted  children." Id.; Perry v. Schwarzenegger, 704 F. Supp. 2d 921, 967 (N.D. Ca. 2010) ("Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful, and well-adjusted."); Varnum v. Brien, 763 N.W.2d 862, 899 (Iowa 2009) ("Plaintiffs presented an abundance of evidence and research, confirmed by our independent research, supporting the proposition that the interests of children are served equally by same-sex parents and opposite-sex parents."); Bishop v. United States, 962 F. Supp. 2d 1252, 1291-95 (N.D. Okla. 2014) (State's argument as to minors was  "so attenuated from any of the asserted goals that the exclusion cannot survive rational basis review…A State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational: at 1288, 1295); Griego v. Oliver, 316 P.3d 865, 887 (N.M. 2013) ("The American Psychological Association, which filed a brief amicus curiae in this case, cites to studies indicating that there is no scientific evidence that parenting effectiveness is related to the parents' sexual orientation…We need not go further than the record in this case for persuasive evidence that same-gender parents are responsible parents."); DeBoer v. Snyder, 2014 U.S. Dist. LEXIS 37274, *9-10, 12, 40 (E.D. Mich. 2014) ("the quality of a person's child-rearing skills is unrelated to the person's gender or sexual orientation…there is no significant difference between the children of same-sex couples and the children of heterosexual married couples….Prohibiting gays and lesbians from marrying does not stop them from

forming families and raising children. Nor does prohibiting same-sex marriage increase the number of children raised by heterosexual parents. There is, in short, no logical connection between banning same-sex marriage and providing children with an 'optimal environment' or achieving 'optimal outcomes.'"); Obergefell v. Wymyslo, 962 F. Supp. 968, 994-95(S.D. Ohio 2013) ("Even if it were rational for legislators to speculate that children raised by heterosexual couples are better off than children raised by same-sex couples, **which it is not,** there is simply no rational connection between the Ohio marriage recognition bans and the asserted goal, as Ohio's marriage recognition bans do not prevent gay couples from having children. The only effect the bans have on children's well-being is harming the children of same-sex couples who are denied the protection and stability of having parents who are legally married."). Whitewood v. Wolf,  at,*19 (M.D. Penn May 20,2014) (same-sex couples and their children "suffer a multitude of daily harms, for instance in the areas of child-rearing, healthcare, taxation and end of life planning.").

In short, there is *no case* since Windsor that suggests that children of same-sex couples are any better or worse off than children of heterosexual couples, and there is no case that has not struck down state statutes banning same-sex marriage. The State of Alabama can provide no evidence to suggest otherwise.

In stark contrast, the Sanctity Laws affirmatively harm the children of same-sex, lawfully married couples in Alabama because these children are made vulnerable by having only one legal parent. As to this child, K.S., what would happen to him were his biological mother, Kimberly McKeand to pass away today? The Sanctity Laws prohibit Searcy from  being recognized as the other legal parent. Therefore, in such a tragic but highly possible situation, K.S. would be in jeopardy of being removed from his home and from the only remaining parent he has ever known while grieving the loss of his biological mother.

The Sanctity Laws unconstitutionally discriminate against children of same-sex, married couples. K.S.'s situation is a prime example of a child being discriminated against under the guise of the Sanctity Laws. Despite (1) being born in Mobile, Alabama at Mobile Infirmary Hospital, (2) having lived in Mobile, Alabama his whole life, (3) attending church and school in Mobile, Alabama, (4) playing baseball and other sports in Mobile, Alabama, (5) going to the doctor in Mobile, Alabama, and (6) doing all the other things that the children of Mobile, Alabama are doing as of the date of this filing. Alabama singles out K.S., and other children of same-sex parents, for separate treatment. With this legally defined form of discrimination, K.S. and other similarly situated children face stigmatization, isolation, marginalization, and are mere pawns

in Alabama's game of "make-believe," that says that Searcy and K.S. are legal strangers despite Searcy having been a parent to K.S. since the day he was born.

This is not fair to K.S., and it is a violation of *his* constitutional rights to equal protection under the law. The State of Alabama owes K.S., and other children who have two parents of the same gender better than that. Fortunately, the United States Constitution provides these children the protection and equal treatment under the law that Alabama refuses to extend. The Equal Protection Clause provides K.S., and other children of same-sex marriages, are no different than children of opposite-gender parents. The Alabama Sanctity Laws should yield to K.S.'s fundamental rights of equality and of quiet enjoyment of his primary familial/parental relationships.

## TRADITION

Alabama asserts a primary governmental purpose under the Sanctity Laws "[a]s a matter of public policy, this state has a special interest in encouraging, supporting, and protecting this unique relationship in order to promote, among other goals, the stability and welfare of society." Plaintiffs respectfully submit this is, in essence, a tradition argument. The Supreme Court has held tradition alone does not satisfy rational basis review. Heller, 509 U.S. at 326 ("Ancient lineage of a legal concept does not give it immunity form attack for lacking a rational basis.").

Traditional notions of marriage are rooted within moral disapproval of same-sex relationships. Many federal courts have already held moral disapproval is not a sufficient rationale for upholding laws when challenged under equal protection. DeBoer, at 42-43; DeLeon at 48-49 (rejecting morality as a justification); Bishop at 101 (holding that "upholding one particular moral definition of marriage…is not a permissible justification."); *Kitchen v. Herbert*, 2013 U.S. Dist. Lexis 179331 *79 (D. Utah 2013); Bourke v. Beshear, 2014 U.S. Dist. LEXIS 17457, *28 (W.D. Ky. 2014) ("That Kentucky's laws are rooted in tradition, however, cannot alone justify their infringement on individual liberties…Over the past forty years, the Supreme Court has refused to allow mere tradition to justify marriage statutes that violate individual liberties."). Again, no federal court has held a state may hide behind tradition as a valid reason to discriminate against same-sex couples. Nothing about this case should require a different holding by this honorable Court.

**B.    THE SANCTITY LAWS VIOLATE THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT.**

**(i) As applied to married, same-sex couples such as Searcy and McKeand, the Sanctity Laws violate the Due Process Clause of the Fourteenth Amendment**

The Due Process Clause guarantees fair process and places substantive limits on a State's authority to constrain individual liberty. The Fourteenth Amendment provides "[n]o state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive a person of life, liberty, or property, without due process of law…" As previously noted, an individual's protected personal liberties include certain fundamental liberties. The Supreme Court has repeatedly recognized marriage as a fundamental right. M.L.B. v. S.L.J., 519, U.S. 102, 116 (1996) (personal choices about marriage "are among associational rights this Court has ranked as 'of basic importance in our society.'"); Planned Parenthood of Southern Pennsylvania v. Casey, 505 U.S. 833, 848 (1987)(holding that marriage is "an aspect of liberty protected against state interference by the substantive component of the Due Process Clause"); Turner v. Safley, 482 U.S. 78, 97 (1987) (holding that a state regulation that prohibited state inmates from marrying without the permission of the warden impermissibly burdened their right to marry); Zablocki v. Redhail, 434 U.S. 374, 383-84(1978) (holding that marriage is a fundamental liberty right); *Carey v. Population Servs., Int'l,* 431 U.S. 678, 684-85 (1977) (holding that the right to privacy includes personal decisions relating to the marriage); United States v. Kras, 409 U.S. 434, 446 (1973) (holding "marriage as fundamental"); Loving v. Virginia, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our existence and survival").

The Supreme Court has held that "the right to marry is of fundamental importance for all individuals." Zablocki, at 384. As one federal judge recently held, marriage is of "exalted status" which involves liberty rights, privacy rights, and associational rights." Latta v. Otter, 2014 U.S. Dist. Lexis 66417 (D. Idaho May 13, 2014) at *33.

In the context of same-sex marriage and same-sex relationships, "[t]he Supreme Court confirmed that gay and lesbian individuals do not forfeit their constitutional liberties simply because of their sexual orientation." Id. at p. 24. (citing and quoting Lawrence v. Texas, 539 U.S. 558, 574 (2003) ("The Court observed that 'our laws and tradition afford constitutional protection to personal decisions relating to

marriage, procreation, contraception, family relationships, child rearing and education.' Emphasizing these rights are personal rights, the Court concluded 'persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do;'" <u>Wolf v. Walker</u>, 2014 U.S. Dist. LEXIS 77125 *44 ("[w]ith respect to marriage in particular, the Supreme Court has stated repeatedly that it is a matter of individual choice;") <u>Hodgson v. Minnesota</u>, 479 U.S. 417, 435 (1990) ("[T]he regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made."); <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse."); <u>Loving</u>, 388 U.S. at 12 ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State. . . The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness."). See also <u>Zablocki</u>, 434 U.S. at 403-04 (Stevens, J., concurring in the judgment) ("The individual's interest in making the marriage decision independently is sufficiently important to merit special constitutional protection.") <u>Wolf v. Walker</u>, 2014 U.S. Dist. LEXIS 77125 *45.

The <u>Windsor</u> opinion held DOMA's definition of marriage as being between one man and one woman coupled with DOMA's refusal to recognize same-sex marriages from any state unconstitutionally caused "interference with the equal dignity of same-sex marriages." <u>Windsor</u>, 133 S. Ct. 2693. Here, the due process violation is not so much that Alabama refuses to grant marriages to same-sex couples; rather, the right to not be deprived of an already-existing marriage and its benefits and protections under the law is at issue.

Alabama has stripped the Plaintiffs of their California issued marriage without any due process of law in direct opposition to the Due Process Clause. <u>Obergefell</u>, 962 F. Supp. at 978 ("In situations like those of Plaintiffs, where same-sex couples legally marry outside of Ohio and then reside in Ohio, a different right than the fundamental right to marry is also implicated: here the constitutional right to due process at issue is not the right to marry, but, instead, the right to not be deprived of one's already existing marriage and its attendant benefits and protections."); *See also*, <u>The Constitutional Right to Keep Your Same Sex Marriage</u>, Steve Sanders, 110 Mich. L. Rev. 1421 (2011).

The right to remain married is a fundamental right. <u>Obergefell</u>, 962 F. Supp. at 978.  The Supreme Court has held  existing marital, family, and intimate relationships are areas upon which the state cannot intrude without substantial justification for doing so. <u>Id</u>. Simply put, "[t]he right to remain married is therefore properly recognized as one that is a fundamental liberty interest appropriately protected by the Due Process Clause of the United States Constitution. Here, Ohio's marriage recognition ban violates this fundamental right without rational justification." <u>Id</u>. at 978. Intermediate scrutiny has been applied to state laws that have the effect of "erasing Plaintiffs' already-established marital and family relations." <u>Id</u>.

Even were the state of Alabama to have a legitimate basis for denying same-sex couples the right to marry within the borders of the state, (which is <u>denied</u> by the Plaintiffs), the <u>Windsor</u> decision and the various district court opinions which followed make clear that marriage-recognition bans are certainly unconstitutional as violative of the Fourteenth Amendment's Due Process Clause. <u>Id</u>. at 981 ("The fact that each state has the exclusive power to create marriages within its territory does not logically lead to the conclusion that states can nullify already-established marriages from other co-equal states absent due process of law. Perhaps the interests raised by [the State of Ohio] may be more compelling in the context of marriage creation than they are in the context of marriages that have already taken place and same-sex relations that already exist, i.e., marriage recognition.").

The reality is Alabama can not offer any reason compelling enough to unilaterally and without notice strip same-sex married couples of their lawful marital status. <u>Id</u>. at 981-82 ("[The State of Ohio] has not provided evidence of any state interest compelling enough to counteract the harm Plaintiffs suffer when they lose, simply because they are in Ohio, the immensely important dignity, status, recognition, and protection of lawful marriage."). No Court has found to the contrary. Accordingly, the State of Alabama's "refusal to recognize lawful same-sex marriages performed in other states violates the substantive due process rights of the parties to those marriages because it deprives them of their significant liberty interest in remaining married absent a sufficient articulated state interest for doing so or any due process procedural protection whatsoever." <u>Id</u>. at 982.

**(ii) As applied to children, such as K.S., the Sanctity Laws violate the Due Process Clause of the Fourteenth Amendment.**

K.S. has a fundamental right to have a family and to enjoy all that goes along with having a stable, two-parent home. The Sanctity Laws' marriage recognition ban has the effect of unilaterally and summarily voiding K.S.'s parents marriage. As a result Searcy cannot adopt K.S., and K.S. cannot enjoy the benefits of having two legal parents because Alabama has unilaterally nullified the lawful marriage of his parents without any notice or opportunity to be heard.

In short, K.S. is deprived of the right to have a stable two-parent family despite Alabama having no substantial governmental interest in preventing him from having such a family.[8]

This outcome is not acceptable for K.S., or the thousands of other children who are living in the State of Alabama with lawfully married same-sex parents. To be clear, K.S. has no father. There was a "sperm donor" that contributed to K.S.'s genetic make up. Legally, he only has McKeand, his biological mother. Until the marriage recognition ban of the Sanctity Laws is struck down, this will remain unchanged. Alabama and the United States owe K.S., and other similarly situated children, better than that. The Plaintiffs respectfully submit that the Due Process Clause of the Fourteenth Amendment provides K.S., and all the other little children just like him, far better than what Alabama has provided up to this point. K.S. does not leave his constitutional rights and protections at Alabama's borders.

Again, one of the primary supposed state interests of the Sanctity Laws is to promote and protect the stability and welfare of children. Even in theory, Alabama's marriage recognition ban falls far from

---

[8]In essence, Alabama tells K.S. as follows:
> "We do not care if your two parents were married in California or some other state. We don't discriminate here in Alabama. We don't recognize a valid marriage of same-sex couples from any state. Once you and your two parents stepped foot back in Alabama, Cari Searcy is a legal stranger to you and **she is not your parent**. You cannot inherit from her under intestate succession. She cannot attend to your medical needs. She cannot attend to your educational needs. She cannot sign permission slips for you to go on field trips and engage in extra-curricular activities. She cannot obtain your school records. She cannot act as your legal representative in the event that you are injured or incapacitated. You cannot receive state benefits if something happens to her. If your biological mother dies, Cari will not be your parent and you may very well be taken away from her and the only home that you have ever known. Anything a legal parent can do for their child, she will not be able to do for you. You only get one parent because your one parent (your biological mother, McKeand) is married to a woman. Even though you are a child and cannot speak for yourself or protect your rights, we, the State of Alabama government, know what is best for you. What is best for you is for Alabama to nullify your parents legal marriage and pretend like your parents are not really married. As a result, you only get one legal parent. While you cannot move yourself, if your <u>one</u> <u>mother</u> does not like it, she can take you and her 'make believe' spouse somewhere else to live. And, by the way, we can and will do all this without a hearing before a judge, no notice to you or your parents will be given, and no evidence shall be permitted as to why Alabama should not do this to you. Again, if you don't like it, tell your supposed two parents that you want to live somewhere else."

accomplishing the stated intended goal. It is logically impossible that such a ban could ever promote stability, when the effect of the law is to strip and dismantle the stable familial relationships of a specified group of citizens. Unilaterally stealing away one of a child's two parents, stripping away the stability of the family home, and preventing a child from having two legal parents ***harms children***. Furthermore, refusing to allow children of same-sex married couples the benefits and protections of having two legal parents does nothing to protect children of heterosexual households or single parent households. The marriage recognition ban and the Sanctity Laws as a whole do nothing than harm selected children and their respective families.

The Supreme Court in <u>Windsor</u>, stated as much, in striking down the federal marriage recognition ban found in DOMA and ruling it was unconstitutional the Court held the law "humiliates tens of thousands of children now being raised by same-sex couples." <u>Windsor</u>, 133 S.Ct. at 2694.  The Court further ruled, the "law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families." Likewise, *Windsor* stated that a marriage recognition ban "also brings financial harm to children of same-sex couples. It raises the cost of health care for families by taxing health benefits provided by employers to their workers' same-sex spouses…and it denies or reduces benefits allowed to families upon the loss of a spouse or parent, benefits that are an integral part of family security." *Id.* at 2695.

On this topic, an Arkansas state court courageously stated in a recent opinion:

> "Even if it were rational for the state to speculate that children raised by opposite-sex couples are better off than children raised by same-sex couples, there is no rational relationship between the Arkansas same-sex marriage bans and this goal because Arkansas's marriage laws do not prevent same-sex couples from having children. The only effect the bans have on children is harming those children of same-sex couples who are denied the protection and stability of parents who are legally married."

<u>Wright v. State of Arkansas</u>, 60 CV-13-2662 (Circuit Court of Pulaski County, Arkansas) (May 9, 2014).

The bottom line is that when a parent's legal relationship to her child is terminated by the state or substantially interfered with, the state must present clear and convincing evidence supporting its action to overcome the burden of the loss to the child and the parent. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982). Alabama's Sanctity Laws do not meet this high burden.

**C.    THE ALABAMA SANCTITY LAWS VIOLATE THE FULL FAITH AND CREDIT CLAUSE OF THE UNITED STATES CONSTITUTION. THE SANCTITY LAWS ALSO VIOLATE TYPICAL CHOICE OF LAW RULES.**

**(i)    The Alabama Sanctity Laws violate the Full Faith and Credit Clause of the United States Constitution.**

The Alabama Attorney General has previously issued an opinion stating Alabama's refusal to recognize civil unions and/or same-sex marriages from other states does not violate the Full Faith and Credit Clause of the United States Constitution. A copy of this Attorney General Opinion is attached hereto as Exhibit H. The Attorney General concluded "[Alabama] can constitutionally apply its own law instead of another State's conflicting law, so long as it has a sufficient contact or aggregation of contacts creating State interests such that application of its law: (1) is neither arbitrary nor fundamentally unfair; (2) is not an unfair surprise to the litigants; and (3) serves a legitimate public policy." Id. at p. 7. Also of note, the Attorney General states:

> "After reviewing the requirements of the Full Faith and Credit Clause and the Due Process Clause, as well as applicable conflict-of-laws principles and Alabama marriage cases, this Office agrees with the House Judiciary Committee that 'a court conscientiously applying the relevant legal principles would be amply justified in refusing to give effect to a same sex 'marriage' license from another State.' Refusing to recognize a same-sex 'marriage' or civil union would not be arbitrary or fundamentally unfair, and (after the controversy surrounding the issue of homosexual 'marriage') would not come as an unfair surprise to the litigants. As shown below, refusing to recognize such a 'marriage' or civil union would also further a legitimate public policy expressed in the Alabama Marriage Protection Act." Id. at 10.

This brief has already addressed the ways in which the Alabama marriage recognition ban is fundamentally unfair, arbitrary, and not rationally related to any legitimate governmental purpose. In short, it serves no legitimate public policy, and the Attorney General's opinion is now squarely wrong in light of Windsor and other significant legal developments in relation to same-sex marriage rights.

Because (1) Alabama has no legitimate public policy interest in refusing to recognize same-sex marriages from other states and (2) the Sanctity Laws are arbitrary and fundamentally unfair, Alabama has no legitimate reason to deny same-sex couples' marital status on the basis of a public policy exception to the Full Faith and Credit Clause.

**(ii) The Alabama Sanctity Laws violate the tradition legal concepts of comity and *lex loci contractus*.**

The traditional and general rule in the United States for interstate marriage recognition is the "place of celebration" rule also known as *lex loci contractus* which provides marriages that are valid in the state where they are celebrated are valid everywhere. Obergefell, 962 F. Supp. 2d at 974. The Supreme Court has explained the concept in which a person can be married in one state while simultaneously remaining unmarried in another state is one of "the most perplexing and distressing complications in the domestic relations of…citizens." Williams v. North Carolina, 317 U.S. 287, 299, 63 S.Ct. 207, 87 L.Ed. 279 (1942). Likewise, "the Supreme Court has established that underlined existing marital, family, and intimate relationships are areas into which the government should generally not intrude without substantial justification." Obergefell, 962 F. Supp. 2d at 978 (emphasis in original) (citing Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984) and Lawrence v. Texas, 539 U.S. 558, 578 (2003)). Therefore, "[b]ased on these principles, the concept that a marriage that has legal force where it was celebrated also has legal force throughout the country has been a longstanding rule in every state." Obergefell, 962 F. Supp. 2d at 978; Joanna L. Grossman, *Resurrecting Comity: Revisiting the Problem of Non-Uniform Marriage Laws*, 84 Or. L. Rev. 433, 461 (2005) ("all jurisdictions follow some version of *lex loci contracts* in evaluating the validity of a marriage.").

Alabama certainly uses the *lex loci contractus* doctrine. Krug v. Krug, 296 So. 2d 715, 717 (Ala. 1974) ("a marriage valid where celebrated is valid everywhere."); Smith v. Goldsmith, 134 So. 651, 652 (Ala. 1931); *Restatement (Second) of Conflict of Laws* § 283 (2)(1969). The Supreme Court has recognized some limits to this general rule such as polygamous marriages, incest, or marriages otherwise declared void by statute if there is a strong public policy reason to do so. Loughran v. Loughran, 292 U.S. 216, 233 (1934).

Despite assertions to the contrary, Alabama has no articuable public policy interest or legitimate state interest as applied to recognizing same-sex marriages from other states. Therefore, Alabama's Sanctity Laws violate traditional notions of comity and *lex loci contractus* in an arbitrary and capricious manner with no legitimate state interest justification for doing so. Alabama should be required to recognize the marriage between the Plaintiffs and other similarly situated couples under these traditional conflict of laws rules.

**D.     THE ALABAMA SANCTITY LAWS CREATE CONFLICTS WITH FEDERAL LAWS, AND, THEREFORE, ARE OVERLY BROAD AND VIOLATIVE OF THE SUPREMACY CLAUSE.**

As noted by the Supreme Court in <u>Windsor</u>, there are over one thousand federal statutes "and a myriad of federal regulations" that concern, touch, or relate to spouses. <u>Windsor</u>, 133 S.Ct. at 2688. The same is certainly true of Alabama law. While it is difficult to state an exact number, various legal database searches reveal that Alabama laws and regulations touch and concern marriage, spouses, and parent child relationships in at least seven hundred (700) Alabama statutes and countless other regulations. This leads to numerous inconsistencies with federal law since DOMA's marital recognition ban was struck down.

For instance, a married, same-sex couple living in Alabama must file their federal tax returns as either "married, filing jointly" or "married, filing separately." However, Alabama's internal revenue department has directed married, same-sex couples to file as "single." Here in Mobile, Alabama, the Plaintiffs are considered married in federal court, wherein the spousal testimonial privilege would apply, yet, three blocks away in state court, it would not.  The Plaintiffs could pursue wrongful death claims on behalf of each other in federal court but would be unable to do so in state court. Were either of them veterans, they would be considered married at aVeterans Administration Hospital, but at a state medical facility or private hospital located in Alabama, they would not. The Plaintiffs are now able to receive federal retirement/social security benefits on behalf of one another whereas they are unable to do so where the state law controls the benefits permitted. The Plaintiffs have been denied spousal, marital and familial recognition in state court.

To the extent any of Alabama's state laws conflict with federal laws, the same are due to be construed in accordance with the federal laws pursuant to the mandate of the Supremacy Clause.

Conflicts between state and federal laws, even mundane laws, now exist that have never existed in the past. This is due in large part to the <u>Windsor</u> opinion that effectively changed the definition of "spouse" to mean anyone who is legally married to another person regardless of gender or sexual orientation. However, the Alabama Sanctity Laws provide a different definition of spouse and marriage. Marriage in Alabama is defined as an inherently unique relationship between a man and a woman. The conflicts this creates, not just in the law, but in the lives of real people, including innocent children, only leads to disastrous outcomes and promotes discrimination, inefficiency, confusion, marginalization and instability in society. It harms the general welfare of the citizens of Alabama, which are the supposed governmental interests which the Alabama Sanctity laws seek to guard against.

**CONCLUSION**

This is a case about marriage equality and the recognition of out of state lawful marriages of same-sex couples, and it is about family stability and equality. Consequently, there is only one real question that we face: Will the three people before this Court be treated as a family or will they continue to be singled out by the State of Alabama and told that they are not a legal family?

Searcy and McKeand may be considered by many to be different, counter-to-culture, anti-religious, out-of-the ordinary or any other number of descriptions. To be sure, non-heterosexual people are a relatively small minority in our country. Most estimates range from two to four percent (2-4%) of the population identify as Lesbian/Gay/Bi-sexual/Transgender (LGBT); a number that is substantially smaller than most racial/ethnic minority groups. The Alabama constitutional amendment, after all, is and was quite popular with the majority of Alabamians. Governor Bentley recently commented "Laws change; people's ideas change…the people of Alabama voted 81 percent to have the ban on same-sex marriage, and it's in our constitution. Whatever the people vote on, I support. I believe in the people's right to vote and this is how they feel, so I support the people." (*http://www.waff.com/story/25579455/gov-on-al-gay-marriage-ban-this-is-how-the-people-feel*).

The question remains though whether this family will receive equal treatment under the law, not whether such treatment it is popular. W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943). ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as a legal principles to be applied by the court…[and] may not be submitted to vote; they depend on the outcome of no elections."). Even the Alabama Constitution provides for equal protection under the law. Hamrick Const. Corp. v. Rainsville Hous. Auth., 447 So. 2d 1295 (Ala. 1984) (finding equal protection under article I, §§ 1 and 13, of the Alabama Constitution); Crabtree v. City of Birmingham, 299 So. 2d 282 (1974) (finding equal protection under article I, § 22 of the Alabama Constitution).

Individual liberty and universal equality is at the heart of what it means to be an American, and the American concept of equality under the law and individual dignity has served as a model for the world. Abraham Lincoln confronted a divisive issue among the states in an effort to resolve equality for all when he said:

"Four score and seven years ago our fathers brought forth on this continent, a new nation, conceived in Liberty, and dedicated to the proposition that all men are created equal. Now we are engaged in a great civil war, testing whether that nation, or any nation so conceived and so dedicated, can long endure…that we here highly resolve that these dead shall not have died in vain -- that this nation, under God, shall have a new birth of freedom -- and that government of the people, by the people, for the people, shall not perish from the earth." *Abraham Lincoln*, Gettysburg Address, (November 19, 1963).

Just as Lincoln faced a bitterly divided country in his *Gettysburg Address*, the issue across the nation and before this court is a divisive one with sharp opinions existing on every side of the issue. As the Pennsylvania district court recently stated, "Some of our citizens are made deeply uncomfortable by the notion of same-sex marriage. However, that same-sex marriage causes discomfort in some does not make its prohibition constitutional. Nor can past tradition trump the bedrock Constitutional guarantees of due process and equal protection." Whitewood v. Wolf, 2014 U.S. Dist. LEXIS 687771, 1938-39 (M.D. Pennsylvania, May 20, 2014). All citizens are entitled to equality and to be treated the same under the law because no mater how powerful a person may be or how much they represent tradition and the political/social establishment, "even the President of the United States sometimes must have to stand naked." Bob Dylan, "It's Alright, Ma (I'm Only Bleeding)," *Bringing It All Back Home*, Sony (1965).

Plaintiffs do not dispute the popularity of the constitutional amendment and statute that make up the Sanctity Laws. However, the popularity of Constitutional amendments do not determine the constitutionality

of the amendment. Certainly, the state officials in Alabama have expressed strong views that are likely aligned with a significant number of Alabama voters.[9]

The electorate cannot alter, order or lawfully sanction a violation of the Due Process Clause, the Equal Protection Clause, or any other constitutionally provided right. City of Cleburne, Tex. v. Cleburne Living Ct.., 473 U.S. 432, 448 (1985).

Alabama has a history of passing laws intended to discriminate against non-heterosexuals. For instance, Ala. Code § 16-40A-2(c)(8) states all schools that teach sex education must teach "[a]n emphasis, in a factual manner and from a public health perspective, that homosexuality is not a lifestyle acceptable to the general public and that homosexual conduct is a criminal offense under the laws of the state." Despite the Lawrence v. Texas Supreme Court holding, wherein no state can criminalize homosexual romantic behavior, Alabama still has a statute on the books that makes performing any type of homosexual sex act a

---

[9] Alabama House Speaker Mike Hubbard (R-Auburn) recently commented: "This lawsuit is part of a coordinated liberal agenda that is designed to erode the conservative values that the citizens of our state hold close to their hearts…By an overwhelming vote in favor of the Sanctity of Marriage constitutional amendment, Alabamians strongly signaled their belief that marriage in our state exists only between a man and a woman. This Republican Legislature will continue fighting against the left-wing policies that Barak Obama and his liberal allies like the SPLC [Southern Poverty Law Center] attempt to force upon Alabamians in spite of their deeply-rooted  conservative beliefs. As I have noted before, the SPLC is nothing more than the ACLU with a southern accent."

Governor Robert Bentley: "I will ensure that Alabama does not follow the trend of allowing gay marriages or civil unions and I will protect our state's right to define marriage as between one man and one woman. I support the Defense of Marriage Act, affirming the right of states not to recognize same-sex marriages licensed in other states. Alabamians should work together to protect traditional marriage. The two-parent family provides the best environment of stability, discipline, responsibility, and character." www.robertbentley2010.com, "The Issues, Nov. 2, 2010.

Attorney General Luther Strange: "A state attorney general has a solemn duty to the state and its people to defend state laws and constitutional provisions against challenge under federal law. To refuse to do so because of personal policy preferences or political pressure erodes the rule of law on which all of our freedoms are founded. A government that does not enforce the law equally will lead our society to disrespect the rule of law." www.theminorityreportblog.com/2014/02/26/republican-state-ags-respond-strongly-to-eric-holder-on-defending-same-sex-marriage-laws.

Supreme Court of Alabama Chief Justice Roy Moore: "We ought to go back to an understanding that God determined that a woman be fit for a man and created a woman for a man…we can't change that. That's not what same-sex marriage is about anyway. Its not about two men getting married or two women, it's about destroying an institution ordained of God. It's about feeling good but ignoring God's laws for happiness, for civilization, for progress[.] "I'm glad they're [Founding Fathers] not here with us to see the mess we're in, how we've given up our righteousness for a life of indulgent sin, when abortion is no longer called murder, when sodomy is deemed a right, when good is now called evil, and darkness is now called light…I don't think we need to submit to the liberal agenda any longer and think they're going to win ... God's waiting to see what we do, what we as his people, called by his name will do…Our children are told they can't pray in school and they teach them evolution. Why can't they see the fear of God is the only true solution? Our schools have become a battleground while all across the land, Christians just shrug their shoulders, afraid to take a stand." http://www.huffingtonpost.com/2014/05/07/roy-moore-gay-marriage-god_n_5281771.html

crime. Ala. Code § 13-6-65(a)(3). So strong is the sentiment against same-sex couples, the Alabama House and Senate recently passed a joint resolution urging the federal government and state officials across the country to call a federal Constitutional Convention for purposes of amending the Federal Constitution to outlaw same-sex marriage in all fifty states. A copy of this Joint Resolution is attached hereto as Exhibit "I".

Undersigned counsel respectfully submits that this Court should not allow the ghost of George Wallace to stand in the door of the marriage license office at the local Probate Courts all over the State of Alabama. The vestiges of prejudice and bigotry should not be allowed to prevent adoptions such as the one sought by this family. It is time for all of Alabama's citizens to enjoy all of the benefits, privileges, and immunities which come with being an American citizen and a citizen of Alabama. This is especially true for K.S. and children similarly situated, that are caught between in the crossfire created by the Sanctity Laws. In reality, K.S. has two parents that love him and will go to the ends of the earth to make his life as satisfying and happy as it can be. It is time for Alabama's government to treat this family equally under the law even if it takes intervention from this Court to accomplish that. The Plaintiffs request this Court mirror the Pennsylvania Court which recently wrote: "We are a better people than what the laws (Pennsylvania's ban on same-sex) represent, and it is time to discard them into the ash heap of history." Whitewood v. Wolf, 2014 U.S. Dist.LEXIS 68771, *50-51. (M.D. Penn. May 20, 2014).

Equality either universally exists, or it does not exist at all. After all, two plus two will never equal five ($2 + 2 \neq 5$).

<u>**EPILOGUE**</u>

"Let us rise up tonight with a greater readiness. Let us stand with a greater determination. And let us move on in these powerful days, these days of challenge to make America what it ought to be. We have an opportunity to make America a better nation…

We've got some difficult days ahead. But it really doesn't matter with me now, because I've been to the mountaintop. Like anybody, I would like to live a long life. Longevity has its place. But I'm not concerned about that now. I just want to do God's will. And He's allowed me to go up to the mountain. And I've looked over. And I've seen the Promised Land. I may not get there with you. But I want you to know tonight, that we, as a people, will get to the Promised Land. And so I'm happy tonight. I'm not worried

about anything. I'm not fearing any man!Mine eyes have seen the glory of the coming of the Lord!"[10]

Martin Luther King, Jr., "I've Been to the Mountaintop" speech from April 3, 1968, at the Mason Temple (Church of God in Christ Headquarters) in Memphis, Tennessee. Dr. King was assassinated the next day. Available at: *http://www.americanrhetoric.com/speeches/mlkivebeentothemountaintop.htm* and *https://www.youtube.com/watch?v=ixfwGLxRJU8*)

---

[10] Martin Luther King dedicated his life to love and to justice between fellow human beings. He died in the cause of that effort…we can make an effort, as Martin Luther King did, to understand, and to comprehend, and replace that violence, that stain of bloodshed that has spread across our land, with an effort to understand, compassion and love… But we have to make an effort in the United States, we have to make an effort to understand, to get beyond these rather difficult times. …What we need in the United States, is not division; what we need in the United States is not hatred; what we need in the United States is not violence and lawlessness, but is love and wisdom, and compassion toward one another, and a feeling of justice toward those who still suffer within our country…" Robert F. Kennedy, April 4, 1968 in Indianapolis, Indiana *(the night of Rev. Dr. Martin Luther King's assassination) available on line at: www.historyplace.com/speeches/RFK-MLK.htm.*

Respectfully submitted this 12th day of June, 2014.

/s/ Christine C. Hernandez Christine C. Hernandez

ASB 8252I64H The Hernandez Firm, LLC

Attorneys for Plaintiffs P.O. Box
66174 Mobile, Alabama 36660-1174

251-479-1477 christine@hernandezlaw.comcastbiz.net

/s/ David G. Kennedy

David G. Kennedy ASB 1238I72K

The Kennedy Law Firm Attorneys for Plaintiffs

P.O. Box 556 Mobile, Alabama 36601

251-338-9805

david@kennedylawyers.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 12th day of June 2014 a true and correct copy of the aforesaid was served on the following via the E-file system and United States Mail:

Hon. James W. Davis
Office of Attorney General
Attorney for Robert Bentley and Luther Strange
501 Washington Ave.
Montgomery, AL 36130-0152

Hon. Catherine M. Donald
201 Monroe Street, Ste.
1150 Montgomery, AL 36104

Hon.Felicia M. Brooks
Dept. of Human Resources
Legal Office

Attorney for Nancy T. Buckner
PO BOX 30400
Montgomery, AL 36130-4000

Hon. Jason Hammier
Attorney for Hon. Don Davis
Johnston Druhan LLP
5 Dauphin Street
Suite 201
Mobile, AL 36602


  /s/ Christine C. Hernandez
Christine C. Hernandez, Esq
Christine@hernandezlaw.comcastbiz.net